*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-BG-338

IN RE GREGORY L. LATTIMER, RESPONDENT.

A Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration Number 371926)

On Report and Recommendation
of the Board on Professional Responsibility
(Board Docket Numbers 11-BD-085 and 15-BD-070)
(BDN170-09, BDN319-09, BDN401-10, and BDN145-14)

(Argued November 4, 2019                    Decided January 16, 2020)

*Gregory L. Lattimer*, pro se.

*Hamilton P. Fox, III*, Disciplinary Counsel, with whom *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, was on the brief, for the Office of Disciplinary Counsel.

Before EASTERLY and MCLEESE, *Associate Judges*, and OKUN, *Associate Judge of the Superior Court of the District of Columbia*.[*]

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

PER CURIAM: In a report consolidating disciplinary cases heard by two Hearing Committees, the Board on Professional Responsibility (the "Board") concluded that respondent, Gregory L. Lattimer, committed multiple violations of the District of Columbia Rule of Professional Conduct 1.4(a) (communication with client) in the course of representing two clients in the District of Columbia, as well as violations of the Virginia Rules of Professional Conduct 1.1 (competence), 1.3(a) (diligence), and 8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation), in the course of representing a third client in Virginia.[1] The Board recommended Mr. Lattimer be suspended for sixty days, with the requirement that Mr. Lattimer pay restitution with interest to the family of one of his clients and provide proof of payment prior to reinstatement. We agree with the Board's conclusions that Mr. Lattimer's conduct violated the District of Columbia and Virginia Rules and adopt the Board's recommendation as to sanction, except that we additionally impose a fitness requirement.

---

[1] Mr. Lattimer is not barred in Virginia but was admitted to practice pro hac vice in the United States District Court for the Eastern District of Virginia in connection with the lawsuit he filed there. The Board applied the Virginia Rules pursuant to District of Columbia Rule 8.5 and Local Civil Rule 83.1(I) of the United States District Court for the Eastern District of Virginia.

## I. Standard of Review

In a disciplinary case, Disciplinary Counsel must establish a rule violation by clear and convincing evidence. *In re Tun*, 195 A.3d 65, 72 (D.C. 2018). This court accepts the factual findings of the Board "if they are supported by substantial evidence in the record."[2] *In re Howes*, 52 A.3d 1, 12 (D.C. 2012); *see also* D.C. Bar R. XI, § 9(h)(1). We review the Board's conclusions of law de novo. *In re Saint-Louis*, 147 A.3d 1135, 1147 (D.C. 2016).

## II. Misconduct

### A. District of Columbia Rule 1.4(a)

To comply with District of Columbia Rule 1.4(a), a lawyer must "keep a client reasonably informed about the status of a matter and promptly comply with

---

[2] The Board did not hold an evidentiary hearing in this case. It adopted all of the findings of fact made by the two Hearing Committees and based its findings of fact thereon, pursuant to Board Prof. Resp. R. 13.7 ("Review by the Board shall be limited to the evidence presented to the Hearing Committee, except in extraordinary circumstances determined by the Board."). In his brief to this court, Mr. Lattimer suggests that the Board should have held an evidentiary hearing, but he did not argue to the Board that a hearing was warranted and we consider this argument waived.

reasonable requests for information." Comment two further provides that "[a] client is entitled to whatever information the client wishes about all aspects of the subject matter of the representation unless the client expressly consents not to have certain information passed on" and that "[t]he lawyer must initiate and maintain the consultative and decision-making process if the client does not do so and must ensure that the ongoing process is thorough and complete." Failing to return a client's calls or respond to their questions violates this rule. *See In re Bernstein*, 707 A.2d 371, 376 (D.C. 1998) (holding an attorney's failure to return his client's telephone calls and promptly answer other requests for information violated Rule 1.4(a)); *In re Dietz*, 633 A.2d 850, 850 (D.C. 1993) (same). A failure to communicate with a client when the client is incarcerated and thus has limited access to the outside world is particularly concerning. *See, e.g.*, *In re Askew*, 96 A.3d 52, 59 (D.C. 2014) (per curiam); *see also In re Fitzgerald*, 982 A.2d 743, 751–52 (D.C. 2009). Mr. Lattimer was charged with violating Rule 1.4(a) with respect to two clients, Roderick Strange and Toby Cooper.

## 1. Roderick Strange

The Hearing Committee, and the Board in turn, made the following findings with respect to Mr. Lattimer's representation of Roderick Strange: Mr. Strange's mother retained Mr. Lattimer to represent her son in his criminal appeal in March 2008. Mr. Lattimer met with Mr. Strange just once in person, at the D.C. Jail, in March. Thereafter, Mr. Strange was transferred to a federal prison in South Carolina. While he was in transit and after he arrived at his destination, Mr. Strange made a number of collect calls to Mr. Lattimer's office. None of his calls was accepted; meanwhile, Mr. Lattimer did not call, write, or visit Mr. Strange. After six months of no contact, Mr. Strange paid for a long distance call to Mr. Lattimer's office in October 2008. A month later, Mr. Lattimer sent Mr. Strange a letter informing him that he had an "outstanding balance" that would need to be paid if Mr. Strange still wanted him to file a brief. That was their final communication. Mr. Lattimer never entered an appearance in the case and never filed any documents with the Court of Appeals, *see* D.C. App. R. 42(a), so an attorney appointed by the court, Ian Williams, ultimately litigated Mr. Strange's appeal.[3]

---

[3] Because Mr. Lattimer never entered an appearance with this court, this court would not have sent any notices to him regarding the state of the record or

(continued…)

Regarding the actual extent of his contact with Mr. Strange, Mr. Lattimer vaguely asserts that "[t]he facts about communication are at odds," and refers us to his exceptions to the Hearing Committee Report, which he "incorporate[s] as if fully set forth" in his brief. In an appeal to this court, it is Mr. Lattimer's obligation to set forth his argument in his brief, and it is not enough for him to "perfunctor[ily]" "advert[]" to issues he raised in a different forum at an earlier stage of the litigation. *Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) (internal quotation marks omitted). In any event, we reiterate that in disciplinary cases, factfinding and, in particular, credibility determinations are delegated to the Hearing Committee and, if it has taken additional evidence, to the Board. *See In re Asher*, 772 A.2d 1161, 1172 (D.C. 2001). Our task is to confirm that these findings are supported by substantial evidence. *In re Howes*, 52 A.3d at 12. The record submitted to the Hearing Committee in this case provides the requisite foundation for the finding Mr. Lattimer had no contact with Mr. Strange for more than six months, despite Mr. Strange's numerous attempts to contact Mr. Lattimer

---

(…continued)

the briefing schedule. Although Mr. Lattimer testified that he checked on the status of Mr. Strange's appeal with the Superior Court "Appeals Coordinator's Office" in May or June 2008, there is no evidence in the record that Mr. Lattimer ever had contact with the Court of Appeals about Mr. Strange's case.

to learn the status of his case.[4]   Mr. Lattimer's assertion that "[t]here was *no* evidence in the record indicating that information was sought and it was not provided" is unsupported by the record.[5]

Mr. Lattimer argues in the alternative that he had no legal obligation under Rule 1.4(a) to keep Mr. Strange reasonably informed or to comply with reasonable requests for information because Mr. Strange's testimony established that "he had no expectation of receiving information from [Mr. Lattimer]."   Mr. Lattimer

---

[4]   Mr. Lattimer argues that Disciplinary Counsel had no evidence that Mr. Strange sent any letters or e-mails, or left any voicemails to which Mr. Lattimer failed to respond, and that the only records it had were "collect calls that were not accepted."   The suggestion that Mr. Strange should have been doing more than making collect calls to Mr. Lattimer is disconcerting from an attorney who touts his extensive experience in criminal and appellate representation.  Mr. Strange was indigent, as evidenced by the fact that this court appointed him counsel.  Calling collect is commonplace for incarcerated individuals with limited resources. Particularly where an incarcerated client has not heard from their lawyer, as Mr. Strange had not, it seems perfectly appropriate that the client would try to call counsel collect to make contact (and would not be able to leave messages if his calls were declined).   As for writing emails or letters, there are a number of reasons, among them privacy concerns, illiteracy, and access (to a computer or the internet), that an incarcerated client might not use these alternate modes of communication.  Finally, it bears repeating that the onus was on Mr. Lattimer, not Mr. Strange, to "initiate and maintain" contact per District of Columbia Rule 1.4, comment 2.

[5]   To the extent Mr. Lattimer seeks to disregard Mr. Strange's testimony to the Hearing Committee and rely instead on his own testimony, his argument fails because, as to the facts detailed above, the Hearing Committee credited Mr. Strange and did not credit Mr. Lattimer.

asserts that Mr. Strange testified that he made a "decision . . . in the summer of 2008" and "considered Mr. Williams his attorney and not [Mr. Lattimer]." But this puts words in Mr. Strange's mouth that he did not say. Instead, Mr. Strange explained that he reached out to Mr. Williams because he and his family had been unable to make contact with Mr. Lattimer and, beginning in late summer, Mr. Strange "considered" Mr. Williams to be his lawyer because "he was the one that was doing everything" in Mr. Strange's case. Although Mr. Strange acknowledged he was looking to Mr. Williams for assistance, he never testified that he "decided" Mr. Lattimer, the attorney his mother had retained for him in March, was *not* his lawyer. To the contrary, the fact that Mr. Strange paid for a long distance call to Mr. Lattimer from prison in October 2008 indicates that Mr. Strange was still looking to Mr. Lattimer to provide him with information about his appeal up until that time.[6]

---

[6] The fact that Mr. Lattimer sent Mr. Strange a letter a month later requesting the balance of his promised fee and offering to file a brief on Mr. Strange's behalf is likewise some indication that, as late as November 2008, Mr. Lattimer himself did not understand Mr. Strange to have "decided" that he was not Mr. Strange's lawyer.

We conclude that Mr. Lattimer's failure to communicate with Mr. Strange for the six months after he was retained violated District of Columbia Rule 1.4(a). *See In re Askew*, 96 A.3d at 59; *In re Fitzgerald*, 982 A.2d at 751–52.

### 2. Toby Cooper

The Hearing Committee, and the Board in turn, made the following findings regarding Mr. Lattimer's representation of Toby Cooper: Ms. Cooper retained Mr. Lattimer on June 18, 2010, to represent her in a federal civil rights lawsuit. Over the next three months (until she terminated his representation), Ms. Cooper had only limited contact with Mr. Lattimer, even though he had led her to believe her case needed to move quickly and even though she reached out to him in different ways, repeatedly. During the month of July, Ms. Cooper sent Mr. Lattimer two packages of case-related documents in the mail,[7] and then, to get updates on her case, emailed him four times and called him seven times. Mr. Lattimer never called her back. He sent Ms. Cooper one email in early July informing her he had not yet filed a complaint. Later that month he sent Ms. Cooper two more emails— apparently prompted by a concern that Ms. Cooper was criticizing him to

---

[7] The second package was a duplicate of the first, but Ms. Cooper resent it when Mr. Lattimer did not timely confirm receipt.

colleagues for being non-communicative—in which he defended his approach to client contact. Ms. Cooper again attempted to connect with Mr. Lattimer in August via email and in September via phone, but without success. On September 22, 2010, Ms. Cooper emailed Mr. Lattimer to discharge him as her attorney and to request a refund of her retainer.

Mr. Lattimer disputes Ms. Cooper's narrative of her many unsuccessful efforts to connect with him, again effectively asking us to reassess the Hearing Committee's credibility determinations.[8] Even if we could, but see *supra* page 6, we would decline to do so. The Hearing Committee heard firsthand from Ms. Cooper, whose testimony was corroborated by phone logs and printouts of the emails, which were entered into the record and never challenged by Mr. Lattimer. In short, there was ample, unimpeached evidence to support the Hearing

---

[8] Mr. Lattimer asserts:

> [Ms. Cooper] did not leave a message, if she did call, and she did not email the Respondent in order to communicate with him as she did when she wanted to discharge him. Had Ms. Cooper called and the Respondent been in the office, her call would have been taken; had she called and left a message, her call would have been returned; had she sent an email or letter it would have been responded to.

Committee's determination that Mr. Lattimer failed to adequately communicate with Ms. Cooper.

Mr. Lattimer also argues that he had no obligation under the Rules to contact Ms. Cooper when "he had no update on her case for her," and that the Rules required him to communicate with Ms. Cooper only when it was "necessary, required, and warranted." We cannot agree. Ignoring or electing not to respond to Ms. Cooper when she reached out to learn the status of her case was not an option. Rather, to keep Ms. Cooper "reasonably informed" per District of Columbia Rule 1.4(a), Mr. Lattimer was obligated to respond and explain the work he had done— or if no work had been done, why this was the case.[9]

We conclude that Mr. Lattimer's minimal email contact and failure to return any of Ms. Cooper's calls for three months after he was retained violated District of

---

[9] Mr. Lattimer argues that "[he] and Ms. Cooper did not have a good relationship at all. In fact it was hanging by a thread[,]" and the "best way" to "salvage whatever relationship that they had" was to minimize his contact with her. If Mr. Lattimer deemed the relationship salvageable, his obligation was to comply with District of Columbia Rule 1.4(a); if he deemed the relationship beyond repair, his obligation was to withdraw from the representation per District of Columbia Rule 1.16(a)(1) ("[A] lawyer . . . shall withdraw from representation of a client if: the representation will result in a violation of the Rules of Professional Conduct . . . .").

Columbia Rule 1.4(a). *See In re Bernstein*, 707 A.2d at 376; *In re Dietz*, 633 A.2d at 850.


**B. Virginia Rules 1.1 and 1.3(a)[10]**


Virginia Rule 1.1 requires lawyers to "provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness[,] and preparation reasonably necessary for the representation." Comment five to the Rule elaborates that:

> Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more elaborate treatment than matters of lesser consequence.

---

[10] While acknowledging that the Virginia Rules were controlling and that Virginia law should direct analysis of whether violations occurred, the Hearing Committee asserted that it "rel[ied] on the Virginia Rules and precedent in reaching its recommendations, except where [it] [was] unable to find relevant precedent. In those situations, the Committee [] look[ed] to the decisions of the District of Columbia Court of Appeals." In the absence of any objection by Mr. Lattimer and because the Virginia Rules closely track the District's corresponding rules, we do the same.

Whether an attorney has "fail[ed] to provide competent representation is a matter decided on a case by case basis." *Weatherbee v. Va. State Bar*, 689 S.E.2d 753, 757 (Va. 2010) (internal quotation marks omitted). Relatedly, Virginia Rule 1.3(a) requires attorneys to "act with reasonable diligence and promptness in representing a client." *See* Virginia Rule 1.3 cmt. 3 (noting that "[a] client's interests often can be adversely affected by the passage of time or the change of conditions"). An attorney may violate either Virginia Rule 1.1 or 1.3(a) by, for example, failing to obtain the necessary documentation to support a motion and failing to file the motion on time. *See, e.g.*, *Rice v. Va. State Bar*, 592 S.E.2d 643, 644 (Va. 2004) (Virginia Rule 1.3(a)); *cf. In re Nwadike*, 905 A.2d 221, 224, 227, 233 (D.C. 2006) (agreeing with the Board's conclusion that attorney violated District of Columbia Rule 1.1(b), which obliges attorneys to "serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters," by failing to file a timely and complete Super. Ct. Civ. R. 26(b)(4) statement because the submission did not include the substance of the expert's expected testimony). An attorney may violate both rules by, inter alia, "suing the wrong defendants; failing to amend the complaint to name the proper defendants after they became known to him . . . [and] failing to request an extension of time to produce an essential expert's report . . . ." *In re Speights*, 173 A.3d 96, 99 (D.C. 2017) (per curiam). Mr. Lattimer was charged with violating Rule 1.1 and Rule

1.3(a) in connection with his representation of Denise Wilkins, who sought to sue the individuals responsible for the death of her son, Justin Lamar Davis, while he was a patient at a state psychiatric hospital.

## 1. Failure to Investigate

The Hearing Committee, and the Board in turn, made the following findings regarding Mr. Lattimer's representation of Ms. Wilkins: Ms. Wilkins's son, Mr. Davis, had been committed to Virginia's Central State Hospital in January 2010. While there, he was killed by another patient who was known by staff to be violent and to have threatened Mr. Davis. Mr. Davis and the other patient were housed on the same ward, in unlocked rooms. An official report of the incident prepared by the hospital determined that the failure of staff to monitor the ward "provided the opportunity" for the attack on Mr. Davis.

In September 2011, Ms. Wilkins hired Mr. Lattimer to file a lawsuit on her behalf and subsequently signed a retainer agreement.[11] Before Mr. Lattimer began work on the case, Ms. Wilkins provided him with a copy of the hospital report with

---

[11] Ms. Wilkins had previously sought assistance from other counsel.

all of the names of the hospital employees redacted. Five months later, in late February 2012 (just before the statute of limitations ran), Mr. Lattimer filed a complaint raising, inter alia, claims of grossly negligent supervision and deliberate indifference, in which he named as one of the defendants the director of the hospital, Vicki Montgomery. Mr. Lattimer sued Ms. Montgomery because he erroneously believed that she was running the hospital at the time of Mr. Davis's death, and he sought to hold her liable in that capacity; in fact, at the time of Mr. Davis's death, the director was Dr. Charles Davis. Although Mr. Lattimer subsequently filed an amended complaint, he again misidentified Ms. Montgomery as the hospital director and again asserted her liability as such.[12] The federal district court ultimately granted Ms. Montgomery's motion for summary judgment,[13] finding that she did not have any relevant supervisory responsibilities at the hospital at the time of Mr. Davis's death. The court also denied Mr. Lattimer's beyond-the-eleventh-hour motion for leave to file a second amended complaint to add Dr. Davis as a defendant because he could not satisfy the

---

[12] For example, Mr. Lattimer argued in his opposition to Ms. Montgomery's motion to dismiss his amended complaint that "*[a]s the Director of the Hospital*, it is reasonable to infer that she was responsible for the day to day operations of the facility and had an obligation to take all reasonable steps to assure the safety of Justin Davis." (emphasis added).

[13] By this time, she was the last remaining defendant.

requirements of Fed. R. Civ. P. 15(c) to allow his amended complaint to relate back to his timely-filed complaint. See *infra* note 21.

Both the Board and the Hearing Committee broadly critiqued Mr. Lattimer's investigation of Ms. Wilkins's case, and on this basis concluded he had violated Virginia Rules 1.1 and 1.3(a). As signaled by our above, abridged recitation of the Board's and Hearing Committee's factual findings, our focus is more tailored.[14] For the purposes of this case, we accept Mr. Lattimer's litigation theory and his decision to sue a senior hospital official in federal court. *See* Virginia Rule 1.3 cmt. 1 ("A lawyer has professional discretion in determining the means by which a matter should be pursued."). We further accept his decision to seek to hold liable the director of the hospital as that senior official. But having made that decision, it was incumbent on Mr. Lattimer to do sufficient, timely investigation to accurately identify who the director of the hospital was at the time of Mr. Davis's death.

---

[14] Thus we need not address many of the challenges Mr. Lattimer raises to the analysis of the Hearing Committee or the Board regarding his failure to take other specific investigative steps, such as taking pre-litigation discovery, obtaining an un-redacted copy of the hospital's investigative report, hiring an investigator instead of conducting his own investigation, or discussing Ms. Wilkins's case with her prior counsel (who testified that he believed the state was willing to settle her case for $500,000). And because we do not rely on the testimony of Disciplinary Counsel's expert, we need not address Mr. Lattimer's arguments as to his qualifications or the appropriateness of his testimony as an expert.

In his initial brief to this court, Mr. Lattimer does not directly address the inadequacy of his investigation into the identity of the director of the hospital at the time of Mr. Davis's death, the fact that he erroneously sued Ms. Montgomery, or his belated, unsuccessful attempt to sue the actual director.[15]  But in the context of challenging a suggestion that he could have discovered the director's identity through pre-filing discovery, he asserts that no discovery was needed because "all one had to do was read the newspaper."  He elaborates in a footnote that "[a]nyone interested in [Mr. Davis's] murder would surely try and educate himself/herself as much as possible.  Reading media accounts about the incident is the least that one would do."

What is notable about this passage is that Mr. Lattimer nowhere asserts that this is what the record reflects *he did* in the four months between taking Ms. Wilkins's case and filing her complaint.  And for good reason.  Mr. Lattimer's file contained no evidence that he read contemporary news reports or tried to "educate

_____

[15]  In his reply brief, Mr. Lattimer "clearly and unequivocally challenges the contention that he did not properly investigate Ms. Wilkins'[s] matter before filing a complaint [and] sued the wrong party," but says nothing more about his erroneous designation of Ms. Montgomery as the hospital director in Ms. Wilkins's complaint or amended complaint, or his failed effort to file a second amended complaint to sue Dr. Davis.

himself[] as much as possible." His file contained no evidence of pre-filing investigation at all, other than one press release announcing Ms. Montgomery's promotion to hospital director, dated October 22, 2010, six months after Mr. Wilkins's death—which itself should have put Mr. Lattimer on notice that more investigation into the identity of the director was required.[16] Mr. Lattimer testified before the hearing committee that, before he filed Ms. Wilkins's complaint in February 2012, he "got on the internet" to "start reading everything that I can about the hospital . . . [about] how it is set up in terms of what they do." He further testified he looked at "personnel" and "I see who does what. Who is in charge of this; who is in charge of that." But not only is there no record of this internet research in his files, his testimony indicates that he was describing what could be seen on the hospital's (presumably current in 2012) website, not newspaper articles from the time of Mr. Davis's death in 2010. And then there is the fact that a newspaper article from the time of Mr. Davis's death very likely would have stated

---

[16] Before the Hearing Committee Mr. Lattimer submitted another set of documents as an exhibit, including personnel action requests and Ms. Montgomery's "Employee Work Profile[s]." But he did not have these documents (which, although they broadly defined Ms. Montgomery's duties, expressly identified her as the Assistant Director of the hospital at the time of Mr. Davis's death) before he filed his complaint. Rather, he obtained these documents through post-filing discovery.

who the hospital director was.[17] Thus Mr. Lattimer's identification of Ms. Montgomery as the hospital "director" in the initial complaint he drafted is itself some proof that he did not review contemporary news articles—i.e., he did not conduct the very type of investigation that he acknowledged to the Hearing Committee would be expected under the circumstances.

Moreover, whatever the extent of his investigation before he filed his initial complaint, he was certainly obligated to do additional investigation once Ms. Montgomery put him on notice in her March 2012 motion to dismiss that she was not the director of the hospital at the time of Mr. Davis's murder. Yet, Mr. Lattimer filed an amended complaint in which he continued to identify Ms. Montgomery as the hospital director, again basing her liability on this purported role. Ms. Montgomery reiterated her denial that she was the hospital director in subsequent court filings, first in another motion to dismiss filed in April 2012, and then in a motion for summary judgment with an accompanying declaration filed in May 2012.[18] Even then, Mr. Lattimer continued to assert that Ms. Montgomery

---

[17] In fact, Mr. Lattimer cites to one such article, for the first time to any tribunal, in his brief to this court.

[18] In her declaration, Ms. Montgomery stated that she was the assistant director of the hospital at the time of Mr. Davis's death, and she disavowed any relevant administrative or supervisory duties in that role.

was the hospital director, or at least the acting hospital director, at the time of Mr.

Davis's death.[19] He did not seek to amend his complaint to sue the correct person

under his theory of the case—Dr. Davis, the actual director of the hospital at the

time of Mr. Davis's death—until December 2012.[20]

---

[19] In his opposition to Ms. Montgomery's motion for summary judgment Mr. Lattimer disputed her pointed denial that she was the hospital director or had any relevant supervisory authority at the time of Mr. Davis's death. But the only evidence he cited to prove she was in fact in charge was the October 2010 press release announcing Ms. Montgomery's appointment as director months after the murder. (This document included the information that Ms. Montgomery had held the position of "acting facility director" twice previously and that her title at the time of the press release was Acting Director, but provided no dates for her tenure in that capacity.)

[20] Mr. Lattimer tried to justify this delay by representing to the district court that it only "became clear" to him that Dr. Davis, as "the former Director of [] Central State Hospital . . . w[as] also directly responsible for the murder of Justin Davis," after Mr. Lattimer obtained discovery, in particular the hospital's unredacted report (which identified Dr. Davis by name), and after he was able to "consult with an expert." But as noted above, Ms. Montgomery had been telling him for months that she was not the hospital director at the time of Mr. Davis's death. Moreover, Mr. Lattimer did not account for the temporal gap between his receipt of the unredacted report in September 2012, and his first action acknowledging that Dr. Davis was the hospital director at the time of Mr. Davis's death—the filing of his motion for leave to file a second amended complaint—in December 2012. Lastly, as discussed below, it appears that Mr. Lattimer did not engage an expert to assist him with this case until November 2012, which itself amounted to a violation of Virginia Rules 1.1 and 1.3(a). See *infra* section II.B.2.

Mr. Lattimer similarly glossed over his delay in identifying the actual director of the hospital at the time of Mr. Davis's death in his oral argument to the Fourth Circuit. He represented that "[o]nce we discovered that [Ms.] Montgomery was the assistant director, as opposed to the director at the time, we[] sought to sue the director." While superficially correct, this statement obscures the fact that Ms. Montgomery told Mr. Lattimer in March 2012 that she was not the hospital

(continued…)

This delay doomed him under Fed. R. Civ. P. 15(c), which sets out the criteria for allowing a plaintiff to add a new defendant in an amended complaint and relate that amended complaint back to a complaint filed before the expiration of the statute of limitations. *See Wilkins v. Montgomery*, 751 F.3d 214, 224, 225 (4th Cir. 2014). It requires a showing, inter alia, that the putative new defendant either knew or should have known of the suit within a particular timeframe (at that time, 120 days after filing).[21] In this case, the federal district court found that there was no reason Dr. Davis, who retired from the hospital in 2010 and moved to a different state, should have known of Ms. Wilkins's suit, filed in 2012. The Fourth Circuit affirmed, explaining that the evidence established that "Dr. Davis was not made aware until December 28, 2012, when he received an email from Appellee's office." *Wilkins*, 751 F.3d at 225 (citing Dr. Davis's declaration and deposition and noting that representations to the contrary were based on unfounded assertions that (1) Dr. Davis and Ms. Montgomery were both represented by the Office of the Attorney General (Dr. Davis was represented by private counsel) and (2) that Dr.

---

(…continued)
director at the time of Mr. Davis's death, but Mr. Lattimer did not acknowledge that Dr. Davis was in fact the hospital director he meant to sue until he moved to amend his complaint in December 2012.

[21] Fed. R. Civ. P. 15(c)(1)(C) (referencing Fed. R. Civ. P. 4(m) (2007)); *see Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 541 (2010).

Davis "still has an office and practices medicine at [Central State Hospital]" (Dr. Davis's unimpeached testimony at his deposition was that he was retired)).

This outcome was avoidable. Had Mr. Lattimer timely identified Dr. Davis as the hospital director and diligently sought leave to amend his initial complaint to add him as a defendant, he could have ensured Dr. Davis had actual notice of Ms. Wilkins's suit within the requisite 120-day timeframe. As detailed above, Ms. Montgomery told Mr. Lattimer just a month after he filed Ms. Wilkins's complaint that she was not the director of the hospital at the time of Mr. Davis's death and was not the person he wanted to sue. Instead of taking corrective action, however, Mr. Lattimer chose to dispute a fact that he himself concedes could have been verified by a review of contemporaneous news articles. By the time he tried to correct course and to amend his complaint to sue Dr. Davis, it was too late.

In sum, Mr. Lattimer aimed to sue the director of the hospital at the time of Mr. Davis's death, but he identified the wrong individual as serving in that role and then failed to timely correct his mistake. To comply with Virginia Rules 1.1 and 1.3, Mr. Lattimer was not necessarily required to identify the correct party before filing the lawsuit, *see Weatherbee*, 689 S.E.2d at 755–57 (concluding the attorney's lawsuit was frivolous in violation of Virginia Rule 3.1, rather than

incompetent in violation of Virginia Rule 1.1, when he sued the wrong doctor in a medical malpractice case), nor was he required to conduct an investigation to determine who the actual director was in any particular way. However, the Virginia Rules did require Mr. Lattimer to make reasonable efforts to investigate who in fact the appropriate parties were under his own theory of the case and to diligently seek to add those parties. *Cf. In re Speights*, 173 A.3d at 99. This he failed to do.

### 2. Failure to Engage an Expert in a Timely Manner

The Board and the Hearing Committee also found that Mr. Lattimer failed to engage an expert in a timely manner. The district court's initial scheduling order required Mr. Lattimer to make expert disclosures pursuant to Fed. R. Civ. P. 26 by October 22, 2012.[22] After he learned on or about October 23, 2012, that an expert

---

[22] Rule 26 requires a party to disclose the identity of any proposed expert "accompanied by a written report—prepared and signed by the witness" which contains "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ.

(continued…)

engaged by Ms. Wilkins's prior counsel could not assist him, Mr. Lattimer sought and received an extension to file by November 21, 2012. On that date, Mr. Lattimer filed with the court a "Certificate Regarding Discovery" in which he represented to the court that a copy of his Fed. R. Civ. P. 26 expert disclosures "were served" on opposing counsel. In fact, he did not serve any report on November 21, and did not serve his expert's one-page "preliminary report" (which was dated November 26, 2012) until two weeks later. Presumably because this preliminary report did not comply with Fed. R. Civ. P. 26,[23] Mr. Lattimer served a full report on December 21, 2012. As the Fourth Circuit later noted, this was one month "after the agreed-upon expert disclosure date, after discovery was closed, after Appellee filed a motion for summary judgment, and on the very date set by the court for the filing of motions to exclude experts." *Wilkins*, 751 F.3d at 223. Because Mr. Lattimer failed to make proper expert disclosures in a timely manner,

---

(…continued)
P. 26(a)(2)(A), (B). "A party *must* make *these* disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D) (emphasis added).

[23] This report merely listed the materials the expert had reviewed and included a single sentence of substance—the expert's conclusory opinion that "to a reasonable degree of medical certainty . . . the care and treatment provided to Mr. Justin Lamar Davis fell substantially below an acceptable standard of care." *Wilkins*, 51 F.3d at 223 (explaining that "Appellant's initial disclosure failed to provide Appellee with any concrete explanation of [the expert's] potential testimony"); but see *supra* note 22 (explaining that Fed. R. Civ. P. 26 requires disclosure of an expert report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them").

the federal district court excluded his expert and granted summary judgment, rulings which the Fourth Circuit affirmed. *Id.*

Mr. Lattimer challenges the Board's determination that he failed to engage an expert in a timely manner as having "no basis in fact, law[,] or logic." He argues that he "engaged two (2) experts in a timely manner," and that "the problem" was "the facts of the case" and his consequent difficulty in "getting an expert to say what was needed and/or desired." There are a number of flaws in this argument.

First, according to Mr. Lattimer's own testimony, he did not hire the first expert; that expert was hired by prior counsel. Second, for reasons he never explained, he only learned that this expert could not assist him the day after the initial filing deadline for expert disclosures. Third, he ultimately *did* find an expert to write a more detailed report that presumably said "what was needed and/or desired," given his repeated argument to the federal courts that the exclusion of this late-filed report was "catastrophic" to his case. Fourth, the fact that this second expert (1) initially provided a facially inadequate one-page (really one-sentence, see *supra* note 23) "Preliminary Report" that post-dated the new

November 21, 2012 deadline for expert disclosures,[24] and (2) provided a full report a month after the missed November 21, 2012 deadline is evidence that Mr. Lattimer engaged this expert too late.[25]

Thus, we conclude that the Hearing Committee's and Board's finding that Mr. Lattimer failed to timely engage an expert is supported by substantial evidence. And we further conclude that this failure violated Virginia Rules 1.1 and 1.3(a). *See Rice*, 592 S.E.2d at 644 (failure to take timely action to permit client's motion for a sentence reduction to be heard constituted a violation of Virginia Rule 1.3(a)); *cf. In re Speights*, 173 A.3d at 99; *In re Nwadike*, 905 A.2d at 227.

---

[24] The earliest documented communication with this expert Mr. Lattimer could provide was dated November 25, 2012.

[25] Mr. Lattimer has not renewed an argument the district court implicitly rejected, namely that his delay in filing his expert report was justified by discovery delays. But we note that in his December 4, 2012, email to Ms. Montgomery's counsel attaching his expert's "Preliminary Report," (1) Mr. Lattimer neither made any mention of inability to file a full report because of issues with discovery nor communicated an intention to provide a more comprehensive report at a later time, and (2) he informed Ms. Montgomery's counsel that "plaintiff has no other initial disclosures to provide."

## C. Virginia Rule 8.4(c)

Virginia Rule 8.4(c) states "[i]t is professional misconduct for a lawyer to: engage in conduct involving dishonesty, fraud, deceit[,] or misrepresentation which reflects adversely on the lawyer's fitness to practice law." The Board and the Hearing Committee concluded that Mr. Lattimer violated this rule when he made certain "unqualified" representations to the Fourth Circuit about Dr. Davis in an effort show that his rejected second amended complaint could fulfill the relation-back requirements of Fed. R. Civ. P. 15(c).

The Board and the Hearing Committee made the following relevant findings of fact: After Mr. Lattimer moved to file a second amended complaint in the Wilkins case naming Dr. Davis as a defendant, the district court allowed Mr. Lattimer to depose Dr. Davis to determine whether he would have had notice of the suit within the requisite timeframe under Fed. R. Civ. P. 15(c). At this deposition, Mr. Lattimer asked Dr. Davis if he still had a relationship with Central State Hospital in 2012; Dr. Davis testified that he had not had an office in the hospital after May 2010 and had no subsequent affiliation with the hospital.[26]

---

[26] We reproduce Mr. Lattimer's relevant exchanges with Dr. Davis:

(continued…)

(…continued)

Mr. Lattimer: Maybe you can clarify something for me. I did look at your biography, and it indicated that you were seeing patients in Virginia as of 2012. Is that inaccurate?

Dr. Davis: That's inaccurate.

[Counsel]: Object—hold on. Objection to the form of the question. It lacks foundation. I don't know what biography you are referring to. But Dr. Davis you may answer the question.

Dr. Davis: Yes. No. I have not had an office in Virginia—I left Central State in May of 2010. And that's it. No practice in Virginia since that time. I've consulted, but not practiced.

Mr. Lattimer: Didn't you have any office at Central State?

Dr. Davis: Not after May of 2010.

Mr. Lattimer: So in 2012, you did not have an office there?

Dr. Davis: I did not. I did not return to Central State after May 28th, 2010.

Mr. Lattimer: Did you have an office in Virginia in 2012?

Dr. Davis: I worked out of my home. But I did not have anything to do with Central State.

\*          \*          \*

Mr. Lattimer: Okay I'm sorry. You did—you indicated that you left Central State—I remember you saying 2010. Can you tell me when that was again?

Dr. Davis: It was in May of 2010, I retired from state service.

Mr. Lattimer: Did you retire from medicine in Virginia at that time?

(continued…)

Notwithstanding receiving Dr. Davis's responses to his deposition questions, Mr. Lattimer represented for the first time in his brief to the Fourth Circuit that Dr. Davis "still has an office and practices medicine at the hospital."[27] In its opinion, the Fourth Circuit noted that Mr. Lattimer's assertion was "belied by the record." *Wilkins*, 751 F.3d at 225. One of the judges on the appellate court then sent a letter to Disciplinary Counsel enclosing the opinion and questioning Mr. Lattimer's "candor to the court."

---

(…continued)

>
> Dr. Davis: No, no. I retired from state service.
>
> Mr. Lattimer: Did you perform any services on behalf of Central State as a private individual, as opposed to a state employee?
>
> Dr. Davis: No, I did not.
>
>        \*       \*       \*
>
> Mr. Lattimer: So your entire or complete affiliation or association with Central State concluded in May of 2010?
>
> Dr. Davis: That's correct.

When Mr. Lattimer again referenced reading Dr. Davis's "biography" and "other pieces of information relating to [Dr. Davis] . . . on the internet," Dr. Davis confirmed that there was erroneous information online because "there are companies who gather information and put it on the internet, whether it's accurate or not."

[27] Before the district court Mr. Lattimer had claimed only that Dr. Davis was still in communication with employees at the hospital, which was consistent with Dr. Davis's deposition testimony.

Mr. Lattimer challenges the Board's determination that he violated Virginia Rule 8.4 by engaging in conduct involving dishonesty based on these facts.[28] Preliminarily, he argues that Dr. Davis's deposition testimony that he kept in touch with colleagues supported a reasonable inference that Dr. Davis "had a continuing relationship with the hospital." But this argument is a red herring. The statement the Fourth Circuit described as "belied by the record" was Mr. Lattimer's specific representation that Dr. Davis "still has an office and practices medicine at the hospital." *See Wilkins*, 751 F.3d at 225.

Regarding this statement, Mr. Lattimer argues that, because there was never any finding by the district court that Dr. Davis did not still have an office or see patients at the hospital, he was free to argue to the contrary to the Fourth Circuit in pursuit of his client's interests.[29] Again, Mr. Lattimer's argument is misdirected.

---

[28] Mr. Lattimer also argues that he did not violate Virginia Rule 3.3, which provides that a lawyer shall not knowingly make a false statement of fact to a tribunal. But the Board determined that Mr. Lattimer had not violated Rule 3.3, and Disciplinary Counsel did not take exception to that determination, so it is not before this court.

[29] He did not, however, make this argument after Ms. Montgomery pointed out in her brief to the Fourth Circuit that that the claim that Dr. Davis "still has an office and practices medicine at the hospital" was a "factual misstatement," "wrong," and with "no evidence in the records to support [the] factual assertion." Although he filed a reply brief, he did not address this issue, much less acknowledge Dr. Davis's deposition testimony to the contrary.

The question is not whether Mr. Lattimer was entitled to dispute on appeal the veracity of Dr. Davis's deposition testimony that he no longer had an office at the hospital or saw patients there[30]; rather, the question is whether Mr. Lattimer could act as if Dr. Davis' unequivocal denials in his deposition testimony—denials that Mr. Lattimer himself elicited—did not exist. The Hearing Committee, and the Board in turn, rightly expressed concern about the "unqualified" nature of Mr. Lattimer's statement about Dr. Davis and his failure "explain the basis for his belief [that Dr. Davis still worked at the hospital] notwithstanding Dr. Davis'[s] deposition." Mr. Lattimer seeks to wrap himself in the cloak of zealous advocacy, but his role as advocate does not authorize him to argue facts he perhaps believed to be true, without acknowledging they were contradicted by record facts.

The Hearing Committee and the Board concluded that Mr. Lattimer's statements to the Fourth Circuit were at least "recklessly false" and amounted to "conduct involving dishonesty" in violation of Rule 8.4(c). We conclude that Mr. Lattimer's statement is more properly characterized as a "misrepresentation" of

---

[30] Whether he had a record basis to do so is subject to question—Mr. Lattimer never confronted Dr. Davis with any particular internet research and only later, before the Hearing Committee, produced an undated internet print out from "Vitals.com" that he asserts gave him a "good-faith basis" to question Dr. Davis's deposition testimony—but we need not resolve that question to conclude that he violated Rule 8.4(c).

record facts in violation of the rule. We look to the Fourth Circuit's application of the similarly phrased 8.4(c) of New York's Rules of Professional Conduct in *In re Liotti*, 667 F.3d 419 (4th Cir. 2011). Noting that "our adversary system depends on a most jealous safeguarding of truth and candor" and "[o]ne of the most important aspects of the work of an appellate lawyer is the obligation to provide the court with a fair and accurate presentation of the relevant facts," *id*. at 429, the court in *Liotti* determined that the attorney had made multiple misrepresentations, including asserting that certain evidence established his client's innocence without revealing to the court that his client had subsequently admitted to a government agent that he had fabricated this evidence (the client then recanted this admission). *Id.* As discussed above, in this case, Mr. Lattimer's affirmative statements about Dr. Davis were similarly contradicted by record facts that he did not acknowledge to the Fourth Circuit.

### III.   Sanctions[31]

Having concluded that Mr. Lattimer committed multiple rule violations, we turn to the question of the appropriate sanction.  D.C. Bar Rule XI, § 9(h)(1) provides that this court "shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted."  We have interpreted this rule as giving "broad discretion" to the Board and correspondingly requiring this court to give "considerable deference" to the Board's recommendation.  *In re Chapman*, 962 A.2d 922, 924 (D.C. 2009) (per curiam).  But we have also recognized that "the responsibility for imposing sanctions rests with this court in the first instance."  *Id.*; *accord In re Goffe*, 641 A.2d 458, 464 (D.C. 1994) (per curiam) ("When the court disagrees with the Board as to the seriousness of the offense or the demands of consistency, . . . the Board's recommendations are accordingly granted less weight." (internal quotation marks omitted)).  Ultimately, "the buck stops here."  *In re Chapman*, 962 A.2d at 924 (internal quotation marks omitted).

---

[31]   Although Mr. Lattimer violated both the District of Columbia's and Virginia's rules, we apply the District of Columbia's law for our sanctions analysis.  *See, e.g.*, *In re Ponds*, 888 A.2d 234, 240, 245 (D.C. 2005).

In this case the Board proposed that Mr. Lattimer be suspended for sixty days for the "totality of [his] proven wrongdoing" and ordered to pay restitution of $4,500 plus statutory interest to Mamie Strange, with proof of payment prior to reinstatement.[32] Mr. Lattimer challenges the Board's recommendation that a term of suspension is warranted in this case; he likewise disputes Disciplinary Counsel's argument that the additional imposition of a fitness requirement is warranted. Mr. Lattimer raises no argument with respect to restitution, and we deem conceded the appropriateness of that sanction.[33]

To determine what sanction to impose, we consider "the nature of the violation, the mitigating and aggravating circumstances, the need to protect the public, the courts, and the legal profession, and the moral fitness of the attorney." *In re Cater*, 887 A.2d 1, 17 (D.C. 2005) (internal quotation marks omitted). Relevant factors include "(1) the nature and seriousness of the misconduct; (2)

---

[32] The Board reasoned that Mr. Lattimer took Ms. Strange's money to represent her son but "contributed nothing of value to Mr. Strange," and in fact did not communicate with him for six months, leading him to believe that Mr. Lattimer "had abandoned his case."

[33] Even if Mr. Lattimer had challenged this sanction, we would conclude that an order to reimburse Ms. Strange was appropriate. *See In re Robertson*, 612 A.2d 1236, 1239–40 (D.C. 1992) (holding that requiring an attorney to pay restitution of monies "that the client paid or entrusted to the lawyer in the course of representation" is a permissible condition of probation or reinstatement).

prior discipline; (3) prejudice to the client; (4) the respondent's attitude; (5) circumstances in mitigation and aggravation; and (6) the mandate to achieve consistency." *In re Vohra*, 68 A.3d 766, 771 (D.C. 2013).

Mr. Lattimer's argument against any term of suspension is premised on a minimization or outright denial of his misconduct that does not align with the account of his rule violations set forth above. This misconduct was sufficiently serious, distressing to his clients, and taxing to our judicial system as to warrant some term of suspension, notwithstanding Mr. Lattimer's limited disciplinary history over his decades of practice.[34] Setting aside aggravating factors[35]—which, as discussed below, we view as compelling a fitness requirement—we are persuaded by the cases the Board cites that a sixty-day term is consistent with the discipline we have imposed in cases where a respondent violated the same or a similar aggregation of Rules. *See, e.g.*, *In re Fox*, 35 A.3d 441, 441–42 (D.C. 2012) (per curiam); *In re Bah,* 999 A.2d 21, 21 (D.C. 2010) (per curiam)

---

[34] In 2006, Respondent was issued an informal admonition for conduct that took place in 2003 involving his failure to properly distribute the proceeds of a settlement, in violation of Rules 1.1(a) (competent representation), 1.l(b) (skill and care), 1.5(e) (failure to advise client in writing of division of fees and responsibilities of co-counsel), and 1.15(a) and (b) (failure to promptly deposit a settlement check in escrow and properly disburse client funds).

[35] Mr. Lattimer has not argued there are any circumstances we should consider in mitigation.

(nonprecedential); *In re Cole,* 967 A.2d 1264, 1268–69 (D.C. 2009); *In re Chapman,* 962 A.2d at 927; *In re Uchendu,* 812 A.2d 933, 941–42 (D.C. 2002); *In re Rosen,* 481 A.2d 451, 455 (D.C. 1984).

Our view of the appropriate sanction diverges from that of the Board, however, on the question of imposing a fitness requirement in addition to a term of suspension. The two sanctions serve different purposes, as we explained in *In re Cater*:

> The fixed period of suspension is intended to serve as the commensurate response to the attorney's past ethical misconduct. In contrast, the open-ended fitness requirement is intended to be an appropriate response to serious concerns about whether the attorney will act ethically and competently in the future, after a period of suspension has run. Primarily, our concern is that the attorney's resumption of the practice of law will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest.

887 A.2d at 22 (internal quotation marks omitted). "[T]o justify requiring a suspended attorney to prove fitness as a condition of reinstatement, the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *Id.* at 6; *see also id.* at 24. To determine whether the requisite serious doubt has been

substantiated, it may be "useful" to consider the criteria we evaluate to determine if an attorney should be reinstated to the bar under *In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985).[36] *In re Cater*, 887 A.2d at 21.

Three broad concerns lead us to conclude that imposition of a fitness requirement is necessary in this case: (1) Mr. Lattimer's adamant refusal to accept responsibility and his corresponding willingness to blame any deficiencies in his representation on his clients; (2) his decision to file a patently frivolous lawsuit against a former client; and (3) his repeated practice before multiple tribunals of presenting a revisionist narrative of his actions.

First, Mr. Lattimer's failure to acknowledge wrongdoing and accept responsibility pervades his arguments to this court. He asserts he committed no rule violations and that the determinations by the Board to the contrary are without foundation. Specifically, Mr. Lattimer argues "[t]here was *no evidence* to support

---

[36] These factors include "(1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law." *In re Roundtree*, 503 A.2d at 1217. The second, third, and fourth factors are particularly pertinent to our discussion below.

a finding that [he] improperly exercised his judgment in prosecuting the claim of Denise Wilkins"; "[t]here was *no evidence* to support a determination that [he] engaged in dishonesty with respect to an argument made to a tribunal" in the Wilkins case; the Board and the Hearing Committee's determination that he failed to adequately investigate the Wilkins case "is *not supported by any evidence of any kind*"; the "contention" that he failed to engage an expert in the Wilkins case in a timely manner "has *no basis* in fact, law[,] or logic"; and that "[t]he Hearing Committee had *no basis* upon which to find that [he] failed to communicate" with either Ms. Cooper or Mr. Strange. (emphasis added).

Instead of accepting responsibility for his misconduct, Mr. Lattimer seeks to blame others, most frequently his clients.[37] He blames Mr. Strange, who was indigent and incarcerated, for only calling collect instead of using other means of

---

[37] He also accuses Disciplinary Counsel of "misrepresent[ing] the record throughout its Brief." We highlight one accusation in particular. Mr. Lattimer notes that Disciplinary Counsel did not acknowledge a letter it sent him proposing informal admonition in connection with alleged misconduct in Mr. Strange's case. Mr. Lattimer suggests that this letter calls into question Disciplinary Counsel's position that he engaged in serious misconduct. But this letter was sent before any evidence was taken in the Strange case (or the Cooper and Wilkins cases). Mr. Lattimer declined the offer of an informal admonition and requested a hearing. At that hearing, evidence was elicited that established that Mr. Lattimer did not communicate with Mr. Strange for six months. Mr. Lattimer himself misrepresents the record by suggesting this prehearing letter in any way undercuts the record established at the subsequent evidentiary hearing.

communication. See *supra* note 4. He asserts Ms. Cooper was a difficult client, while ignoring the root cause of the problem: his failure to adequately communicate with her.[38] Most shocking, Mr. Lattimer now claims that the Wilkins case was flawed from its inception because (1) his client, Ms. Wilkins, "had caused [her son, Mr. Davis,] to be at Central State Hospital," and (2) Mr. Davis was an unstable and violent individual.

We are extremely concerned that Mr. Lattimer would insinuate that Ms. Wilkins was in some part responsible for her son's killing by another patient simply because she called the authorities when her son was in crisis, which eventually led to his hospitalization. With Mr. Davis in its custody, Central State Hospital was responsible for his care and protection; and, as Mr. Lattimer well knows, an official state report concluded that his death was the result of "substantiated" "staff neglect." We are similarly dismayed by Mr. Lattimer's graphic description of Mr. Davis's behavior while in the throes of mental illness and his insinuation that Mr. Davis's violent behavior precipitated his death. As a society, we commit individuals to psychiatric facilities when mental illness has rendered them a danger to themselves or others; and, for the duration of their

---

[38] He then makes the illogical argument that to "salvage their relationship" he had to minimize contact with her. See *supra* note 9.

commitment, it is the responsibility of the facility to keep them and others safe. Mr. Lattimer's arguments about Ms. Wilkins and her son are denigrating as well as diversionary. We cannot say if Ms. Wilkins could have ultimately won her case. But we know why she lost: Mr. Lattimer failed to timely name as a defendant the individual who was the director of the hospital at the time of Mr. Davis's death as required by his own theory of the case, and he failed to timely file his expert report. In short, the faults apparent in Mr. Lattimer's representation are his alone, and his refusal to accept responsibility and his inappropriate blame-shifting are grounds to question his fitness.

Mr. Lattimer's treatment of his clients leads us to our second major concern: Mr. Lattimer's decision to sue one of his clients, Ms. Cooper, for alleged defamatory statements she made to the D.C. Bar Clients' Security Fund ("CSF"). Ms. Cooper applied to the CSF in an attempt to recoup funds Mr. Lattimer had refused to return to her.[39] Pursuant to Bar Rules, Ms. Cooper's statements to the

---

[39] After Mr. Lattimer initially declined to refund the money Ms. Cooper had paid him, she filed for arbitration with the Attorney/Client Arbitration Board, where she was afforded a full refund. Mr. Lattimer did not refund the money, so she petitioned the Superior Court to confirm the award. Mr. Lattimer opposed her petition in Superior Court, so Ms. Cooper applied to the CSF. We do not consider this history in determining the need for a fitness requirement, nor do we fault Mr. Lattimer for legally engaging in a fee dispute in Superior Court; however, Mr.

(continued…)

CSF were absolutely privileged, and she was immune from any suit based on those statements. D.C. Bar R. XII, § 14 ("Claims submitted to the [CSF] shall be absolutely privileged, and no complaint or action predicated thereon may be instituted or maintained."). Mr. Lattimer's lawsuit against Ms. Cooper was both frivolous and harassing. *Cf. In re Spikes*, 881 A.2d 1118, 1119 (D.C. 2005) (holding that a defamation suit predicated in part on a complaint made to bar counsel, covered by an analogous immunity provision, was frivolous in violation of Rule 3.1).

In an effort to defend his decision to sue Ms. Cooper, Mr. Lattimer argues that "[b]ut for the immunity umbrella, success was certain." This argument hurts rather than helps Mr. Lattimer because it demonstrates his continued failure to understand the protection D.C. Bar R. XII, § 14 provides. There was no possibility of success because there was no legitimate suit to bring; statements made to the CSF are not actionable. Equally troubling is Mr. Lattimer's argument that "he had never heard of [CSF] before, did not realize that it was associated with the Bar, and when he did, he dismissed the lawsuit." Mr. Lattimer's ignorance of the D.C. Bar

---

(…continued)
Lattimer went far beyond what was legally and professionally acceptable when he filed a frivolous lawsuit against Ms. Cooper.

Rules concerning the CSF is an aggravating, rather than mitigating, factor in our consideration of his competence as a member of our Bar because it defeats the very protection the rule is intended to provide. *Cf. In re Millstein*, 667 A.2d 1355, 1356 (D.C. 1995) (per curiam) (recognizing ignorance of the Rules of Professional Conduct to be an aggravating factor). Likewise his subsequent withdrawal[40] of the suit does not absolve him of frivolously filing it.

The Hearing Committee and the Board considered this lawsuit to be an aggravating factor, and so do we. *See In re Baber*, 106 A.3d 1072, 1075, 1077 (D.C. 2015) (per curiam) (holding that an attorney's frivolous lawsuit against a former client was an aggravating factor). This lawsuit was "detrimental to the integrity and standing of the Bar, [] to the administration of justice, [and] subversive to the public interest." *In re Cater*, 887 A.2d at 22. Mr. Lattimer's continued insistence that the suit had some merit and his attempted excuse that he did not know the Bar Rules make his lawsuit against Ms. Cooper a compelling reason to impose a fitness requirement.

---

[40] Mr. Lattimer's particular motivation does not affect our analysis. The Board never determined what prompted him to withdraw the suit—his independent research, or a letter from Disciplinary Counsel calling Mr. Lattimer's attention to the fact that Ms. Cooper's statements to the CSF were privileged.

In addition to his failure to accept responsibility, his efforts to shift blame for his shortcomings to his clients, and his decision to bring a patently frivolous lawsuit against client, we add one more consideration: Mr. Lattimer's persistent willingness to revise history and take whatever position best suits his needs at that particular time, as evidenced by his litigation of this disciplinary matter.

For example, as discussed above, Mr. Lattimer sought to sue Ms. Montgomery because he erroneously thought she was the director of the hospital at the time of Mr. Davis's death, see *supra* section II.B.1. But when faced with the accusation that he failed to adequately investigate his case to ensure he timely named the correct individual as a defendant, Mr. Lattimer told the Hearing Committee that he knew all along that Ms. Montgomery was the assistant director at the time of Mr. Davis's death and Dr. Davis was the actual director of the hospital.[41] According to this new, nonsensical narrative, (1) he decided to sue only

---

[41] Mr. Lattimer's testimony was as follows:

> Question: And Ms. Montgomery was at the time the assistant director of the hospital, correct?
>
> Answer: She was assistant director.
>
> Question: You knew that when you filed the lawsuit?
>
> Answer: Of course I did.

Ms. Montgomery, even as he knowingly misidentified her[42]; (2) he knowingly chose not to sue Dr. Davis because, for some unexplained reason, he had "to make a choice," and he chose Ms. Montgomery over Dr. Davis because he somehow determined that Dr. Davis was just a "figurehead"; and (3) despite the uncontestable fact that he ultimately did move to amend his complaint a second time to add Dr. Davis, he currently maintains Ms. Montgomery was the "*only*" person to sue.[43]

Similarly, although Mr. Lattimer told the District Court and the Fourth Circuit that his expert was "immeasurabl[y]" important and that his exclusion was "catastrophic," once faced with an accusation of misconduct, he told the Hearing Committee and this court that he did not need an expert. And the fact that he did ultimately file a more detailed report, just too late, is inconsistent with his assertion

---

[42] Mr. Lattimer testified:

> Question: [W]hy did you call her the director [in your complaint]?
>
> Answer: She was the director at the time I filed the lawsuit.
>
> Question: Did you say anywhere in the lawsuit that she wasn't the director at the time the events occurred?
>
> Answer: No, I didn't. Why would I do that?

[43] Mr. Lattimer seemingly forgets his inconvenient assertions to the District Court and the Fourth Circuit that "once" he "discovered" Ms. Montgomery was the assistant director, he sought to add Dr. Davis as a defendant. See *supra* note 20.

in these disciplinary proceedings that he was stymied in filing an expert report at all because of the challenging "facts" of the Wilkins case.[44]

Lastly, we have already discussed how Mr. Lattimer argued in the Fourth Circuit, without any acknowledgment of the directly contradictory record evidence that he elicited from Dr. Davis at his deposition, that Dr. Davis still had an office or practiced medicine at the hospital. See section II.C.

To recap and put the above observations in the framework of *In re Cater*, 887 A.2d at 22, and the factors set forth in *In re Roundtree*, 503 A.2d at 1217, Mr. Lattimer has failed to acknowledge any evidence of wrongdoing or recognize its seriousness. His blaming and shaming of his clients is "subversive to the public interest" and leads us to be skeptical of his willingness to remedy past wrongs as well as his present character. *In re Cater*, 887 A.2d at 22. His frivolous lawsuit and ignorance of the Rules were "detrimental to the integrity and standing of the Bar" and "to the administration of justice." *Id.* Lastly, his willingness to engage in

---

[44] We would be remiss if in discussing the expert report in Ms. Wilkins's case we did not also note that Mr. Lattimer appeared to be revising history in real time in the federal district court litigation. This is exemplified by the fact that he falsely certified that he had provided his expert's preliminary report to counsel on November 21, 2012, even though the expert did not submit the (undated) preliminary report to Mr. Lattimer until November 26, 2012.

revisionist history in this court and rewrite facts to his advantage calls into question not only his present character but also his present competence to practice law. All this amounts to clear and convincing evidence that "casts a serious doubt" on Mr. Lattimer's continuing fitness to practice law and thus justifies the imposition of a fitness requirement. *Id.* at 6.

## IV.

For the reasons stated above, we conclude that Mr. Lattimer violated District of Columbia Rule 1.4(a) and Virginia Rules 1.1, 1.3(a), and 8.4(c) and impose a sanction of a sixty-day suspension, restitution, and a fitness requirement.

*So ordered.*